UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- x

DIANA LUCENTI,

                      Plaintiff,                               **OPINION & ORDER**

        -against-

UNITED STATES OF AMERICA,                     **19-cv-6185 (NG)(LGD)**

                      Defendant.

--------------------------------------------------------- x

GERSHON, United States District Judge:

## I.    Introduction

This Opinion and Order follows a four-day bench trial in a medical malpractice action brought by veteran Diana Lucenti against the United States of America in its capacity as the administrator of the Department of Veterans Affairs ("VA"), which owns and operates a hospital in Northport, Virginia ("VAMC Northport") where the plaintiff received medical treatment. Ms. Lucenti asserts claims under the Federal Tort Claims Act (the "FTCA"), alleging that the government, through the hospital's employees, negligently failed to diagnose her with renal cell carcinoma based on a CT scan that was taken in July 2015, resulting in a three-year delay in her cancer diagnosis and causing Ms. Lucenti's cancer to metastasize. The plaintiff asserts that the delayed diagnosis dramatically changed her prognosis from a 95% chance of being cured to now having a five-year life expectancy from the time of the discovery of a metastasis, or a life expectancy of August 2027.

This Opinion and Order constitutes the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. The court finds for the plaintiff and awards damages in the amount indicated below.

## II.    Procedural History

The plaintiff commenced this action on November 1, 2019.  Prior to trial, the government "stipulated that the generally accepted standard of medical practice was to follow up on the subtle hypodensity in the medial pole of Plaintiff's left kidney seen on Plaintiff's July 3, 2015 abdominal/pelvic CT scan by, after appropriate therapy, conducting imaging of Plaintiff's kidneys using renal mass protocol, and that it was a departure from that standard when that follow up imaging was not done until July 19, 2018."  Joint Pre-Trial Order ("JPTO"), at 3.  During the pre-trial period, it was discovered that the renal cell carcinoma had metastasized to the plaintiff's thyroid.  Additional pre-trial proceedings were necessary as a result of that discovery and, ultimately, the government stipulated "that the aforementioned departure from the standard of care was the proximate cause of metastatic renal cell carcinoma to Plaintiff's thyroid."  *Id.*  However, it contests whether the renal cell carcinoma proximately caused certain of Ms. Lucenti's claimed injuries and the damages to be awarded.

From November 13th until November 17th, 2023, this court held a four-day bench trial. The plaintiff called three witnesses: herself, Dr. Dinesh Singh, an expert in urology, and Kristin Kucsma, an expert in economics. The government called two witnesses: Dr. Mitchell Benson, an expert in urologic oncology, and Dr. Joel Neugarten, an expert in nephrology.[1]

---

[1] **Dr. Singh** attended Columbia University for medical school, completed a residency at Harvard Medical School in a urology program and a fellowship at the Cleveland Clinic Foundation. Following his fellowship, since 2004, he has been on the faculty at Yale University School of Medicine.   At Yale, he is an Associate Professor of Urology and Director of Endourology Minimally Invasive Surgery and Director of the Minimally Invasive Surgery Fellowship.   He is board certified in urology.  Dr. Singh has received numerous honors and awards throughout his career, including graduating AOA, which is an honor society for the top graduates of medical school, and receiving the first-place prize for cancer research in urology from the Society of Urologic Oncology and a prize for best research, which related to oncology research he completed during residency.  Dr. Singh has treated more than 1,000 kidney cancer patients and has published numerous articles on the subject of kidney cancer.  **Dr. Benson** attended Columbia University for

2

Case 2:19-cv-06185-NG-LGD   Document 59   Filed 08/06/24   Page 3 of 36 PageID #: 693

## III.    Findings of Fact

I begin by noting my conclusions as to Ms. Lucenti's credibility.  Although she testified

via video transmission, I was able to observe her carefully.[2]  Throughout her testimony, Ms.

---

medical school, completed a surgical internship and surgical residency at Mount Sinai Hospital and a urologic residency at Columbia University.  Following his residency, he was a research fellow in urologic oncology at Johns Hopkins University and Hospital.  Since 1984, he has been on the faculty of Columbia University as a full professor of urology and an attending urologist at New York Presbyterian Hospital.  He is board certified in urology.  Dr. Benson has performed hundreds of nephrectomies and treated many patients for kidney cancer.  He has also written and given presentations in the field of urologic oncology.  **Dr. Neugarten** obtained his medical degree from Albert Einstein College of Medicine.  He was trained in internal medicine at Mount Sinai Medical Center in New York and then subsequently completed a fellowship in nephrology at New York University in New York and a research fellowship in nephrology at Albert Einstein College of Medicine.  He is currently an attending nephrologist at Montefiore Medical Center in the Bronx and a professor of medicine at the Albert Einstein College of Medicine.  He is board certified in internal medicine and nephrology.  Dr. Neugarten has practiced in the field of nephrology for more than 35 years and, currently, sees about 350 patients per month.  He has also published numerous articles in the area of progressional renal disease and chronic kidney disease.  **Ms. Kucsma** holds a Master of Arts degree in economics from Rutgers University.  Ms. Kucsma was also enrolled in a Ph.D. program in economics and, while she completed all of her coursework in that program and passed her qualifying examinations, she did not complete her dissertation for that program.  She has significant experience in the areas in which she testified.

[2] Prior to trial, the plaintiff moved under Federal Rule of Civil Procedure 43 for permission to testify via a live video transmission from Florida, where she now resides, stating that her treatment for metastatic renal cell carcinoma rendered travel to New York too difficult.  An accompanying letter from the nurse practitioner of Ms. Lucenti's treating physician stated that she was unable to travel "due to persistent fatigue and ongoing immunotherapy treatment."  Mot. Regarding Remote Test., Ex. 1, at 1.  I permitted the plaintiff to testify via a live video transmission from the United States District Court for the Southern District of Florida's West Palm Beach Federal Courthouse.  There, the Clerk's office and technical support team provided a room for Ms. Lucenti in the courthouse to testify and furnished all necessary technical support.  Under Rule 43, Ms. Lucenti established "good cause in compelling circumstances" to testify from Florida, and the live video transmission from the West Palm Beach Federal Courthouse provided "appropriate safeguards" for the remote testimony.  While the government, initially, expressed some opposition to the use of video testimony, once appropriate safeguards were in place, it did not raise any issues suggesting that the video transmission would be problematic.  In fact, the video transmission functioned effectively.  I here acknowledge the cooperation and extraordinary efficiency of the Clerks' offices at the EDNY and West Palm Beach.

Lucenti was candid and straightforward, and she never attempted to embellish her testimony.  I found her entirely credible.

Ms. Lucenti was born on September 24, 1954, and, at the time of the trial, was 69 years old.  After graduating from high school, Ms. Lucenti joined the United States Navy in 1977 and served until 1979 when she was honorably discharged.  Following her service in the Navy, Ms. Lucenti became a licensed practical nurse ("LPN") and then a registered nurse ("RN").  She also earned a bachelor's degree in behavioral sciences.  She currently works part-time as an RN, which has been her occupation for the last twenty-five years.

### a.  Findings Regarding the History of Ms. Lucenti's Medical Treatment Relating to the Delayed Diagnosis

As a veteran, Ms. Lucenti has relied on the VA for her medical care since 2011.

On July 3, 2015, Ms. Lucenti was admitted to VAMC Northport, after experiencing lower abdominal pain and a 102 degree fever.  At the hospital, Ms. Lucenti had a urinalysis and a CT scan of her abdomen and pelvis.  The CT scan revealed a "[s]ubtle hypodensity in the medial lower pole of the left kidney." Ex. B, at 1239–40.  The radiology report stated: "[f]ollow-up imaging of the kidneys using renal mass protocol, after appropriate therapy is recommended."  *Id*., at 1240.  At that time, Ms. Lucenti had a mass in her left kidney, which measured 2.1 centimeters.  On July 6, 2015, Ms. Lucenti was discharged.  The recommended follow-up imaging using renal mass protocol was not performed nor was one scheduled for a future date.  This failure is the departure from the generally accepted standard of medical practice to which the government has stipulated.

Around July 2018, Ms. Lucenti was "consistently not feeling well" and had "left flank pain and, again, lower abdominal pain."  Trial Tr. 22.  On July 19, 2018, she presented to the VAMC Northport emergency department with "lower abdominal pain, nausea, chills," "dizziness," and "blood in the toiliet" (sic).  Ex. B, at 0450.  On the same date, she underwent a CT scan of her

4

abdomen and pelvis.  The CT scan showed a 6.8 centimeter mass in her left kidney, which was "highly concerning for a renal cell carcinoma."  *Id.*, at 0459.  It is not disputed that Ms. Lucenti's 6.8 centimeter mass, which had grown from the 2.1 centimeter mass that was detected in July 2015, was, indeed, renal cell carcinoma.  Thus, the government's delayed diagnosis of Ms. Lucenti's left kidney cancer was approximately three years.  And Ms. Lucenti has established that the symptoms that she experienced around July 2018 were proximately caused by the government's missed diagnosis.

After the CT scan, Ms. Lucenti was referred to John Fitzgerald, a urologist at VAMC Northport, for further evaluation.  In August 2018, Dr. Fitzgerald recommended a total nephrectomy (complete removal) of her left kidney, which occurred on August 24, 2018.  She spent six days in the hospital.  Ms. Lucenti did not establish that the government's negligence proximately caused any physical injuries relating to the total nephrectomy surgery itself or any physical symptoms associated with the recovery from that surgery: She presented no evidence that would distinguish between the pain and suffering that she experienced from the total nephrectomy procedure, as opposed to an alternative procedure, such as a partial nephrectomy, that she would have had to undergo had she been properly diagnosed in 2015.

Ms. Lucenti had medical issues involving her thyroid.  In 1999, Ms. Lucenti had a partial thyroidectomy, or part of her thyroid removed, for benign goiter.  After that, her thyroid was under increased surveillance.  In October 2018, in a follow-up visit with Dr. Fitzgerald at the VAMC Northport, she was advised that she should be evaluated by the endocrinology department.  On December 13, 2018, Ms. Lucenti had a biopsy taken of her left thyroid, which showed a benign nodule.

5

In July 2019, Ms. Lucenti received medical treatment for her right kidney at Stony Brook University Hospital.  A biopsy taken of her right kidney showed kidney cancer, which was successfully treated with cryoablation, a procedure that freezes the portion of the kidney with the tumor to kill the cancer within it.  The procedure results in the loss of functioning of that portion of the kidney but allows the rest of the kidney to maintain its functioning.  Ms. Lucenti does not assert any claim arising from her right kidney cancer.

In 2019, Ms. Lucenti moved to Florida because she has "a lot of family" there and she "was told that it was cheaper to live" in Florida.  Trial Tr. 37.

In September 2021, Ms. Lucenti had another biopsy taken of her left thyroid at the VAMC West Palm Beach.  It was diagnosed as a "[b]enign nodule."  Ex. B, at 2325.  In July 2022, the VAMC West Palm Beach referred Ms. Lucenti to the University of Miami Medical Center ("UMMC").  In August 2022, the UMMC reviewed the results of the biopsy that was taken at the VAMC West Palm Beach in September 2021 and diagnosed Ms. Lucenti with metastatic renal cell carcinoma.  In other words, the UMMC determined that Ms. Lucenti's left kidney cancer had metastasized to her thyroid.  As noted, the government has stipulated that its departure from the standard of care in not diagnosing her renal cell carcinoma in 2015 was the proximate cause of the metastasis to her thyroid.

On September 22, 2022, Ms. Lucenti underwent a PET/CT scan from skull to thigh at UMMC, which revealed an "[e]nlarged neck mass centered at the thyroid gland measuring approximately 6.5 x 5.3 cm" and "extending from the left oropharynx to the thoracic inlet/upper anterior mediastinum," "resulting in displacement of the supraglottic, glottic airway, as well as the trachea."  Ex. D, at 0603 & 0604.  On September 29, 2022, Ms. Lucenti had an appointment with Dr. Rakesh Singal, an oncologist at the UMMC.  She reported "dizziness for the last month,"

6

feeling "tired," and "constipation." *Id.*, at 0598. Dr. Singal recommended that she undergo a "surgical resection" of the tumor. *Id.*, at 0605.

On November 23, 2022, Ms. Lucenti underwent a total thyroidectomy and mediastinotomy at UMMC to remove the tumor. The surgery performed was "transcervical mediastinotomy and resection of mediastinal mass." *Id.*, at 0030. Ms. Lucenti was "scared to death" to have the thyroidectomy because they told her "that the nodule was huge, and it was very risky surgery." Trial Tr. 28. After the surgery, Ms. Lucenti was in "a lot of pain" at the "incision site" in her neck. *Id*. She also "experienced a lot of pain in the back of [her] neck from the continual hyperextension of [her] neck while they were doing the surgery" and "nausea and vomiting from the anesthesia." *Id*. In the "immediate" period after the surgery, Ms. Lucenti was scared and "in a lot of pain." *Id*. Following the surgery, the UMMC confirmed that Ms. Lucenti had metastatic renal cell carcinoma. Ms. Lucenti established that the mental and physical injuries relating to the thyroid metastasis and her thyroidectomy were proximately caused by the government's missed diagnosis.

On November 25, 2022, Ms. Lucenti was discharged from the hospital. She was prescribed Synthroid, a thyroid hormone replacement that she must take for the rest of her life.

Following the thyroidectomy, Ms. Lucenti has been advised to undergo PET/CT scans every three months to detect any further metastases in her body. At the time of trial, Ms. Lucenti had had three such PET/CT scans. Ms. Lucenti feels "anxious" "[i]n the days" leading up to and when she gets the PET/CT scans because she is "claustrophobic" and must be in an enclosed space without the ability to move for the entirety of the PET/CT scan, or about 40 minutes. *Id.* 31. To the date of the trial, the PET/CT scans had not detected any further metastases.

On January 6, 2023, Dr. Singal also recommended that Ms. Lucenti take "Pembrolizumab for 1 year." Ex. D, at 0863. Pembrolizumab is an immunotherapy. It is a drug that works by enabling the body's T cells to identify cancer cells and destroy them. As discussed in greater detail below with regard to the disagreement between the parties' experts, Pembrolizumab is not a "preventative medication." Trial Tr. 154. Rather, Pembrolizumab is administered to treat the high likelihood that Ms. Lucenti has other cancer cells in her body, though they have not yet been detected on her PET/CT scans. Pembrolizumab is given intravenously. It "goes everywhere blood goes . . . because the idea is to give this medication to attack the cancer cells wherever they may be . . . in other parts of her body, whether it's lungs or brain or bone or other visceral organs." *Id.* 130. Dr. Dinesh Singh, the plaintiff's expert, testified about the harmful side effects of Pembrolizumab. He explained that such side effects can include nausea, vomiting, diarrhea, muscle cramping, bone pain, fatigue, liver problems, edema of the eyes, feet, lungs, or heart, congestive heart failure, anemia, and depressed white blood cell counts.

In January 2023, Ms. Lucenti began her course of treatment of Pembrolizumab. She was given Pembrolizumab approximately every three weeks. It is administered in a hospital setting and takes between 45 minutes to an hour. At the time of the trial, Ms. Lucenti had had 10 such treatments. Following her first two Pembrolizumab treatments, Ms. Lucenti reported that she "gets tired" and has "diarrhea," "constipation" and "nausea" on the "first day" of her Pembrolizumab treatments. Ex. B, at 3580.

Following her third Pembrolizumab treatment, Ms. Lucenti reported "moderate fatigue for three days" and "acid reflux that was relieved with Peptobismol." Ex. D, at 1994, 1929. Beginning in May 2023, following her fifth Pembrolizumab treatment, Ms. Lucenti reported "persistent tiredness for the last 3 weeks" and "stomach discomfort that was relieved with Mylanta or

8

Peptobismol." *Id.*, at 1865. Following her sixth Pembrolizumab treatment, Ms. Lucenti continued to report "persistent tiredness for the last 3 weeks." *Id.*, at 1772, 1729. Following her eighth Pembrolizumab treatment, which occurred in August 2023, Ms. Lucenti experienced "persistent tiredness" and reported that it was "getting worse." *Id.*, at 1562. On October 3, 2023, Ms. Lucenti continued to report "ongoing" "fatigue that is getting worse." *Id.* Following her ninth Pembrolizumab treatment, Ms. Lucenti continued to report "persistent tiredness" and "ongoing fatigue." *Id.*, at 02737. Such symptoms are consistent with the side effects that Dr. Singh testified can result from Pembrolizumab treatments, including fatigue, diarrhea, muscle cramping, and nausea. Ms. Lucenti's "persistent tiredness" or "ongoing fatigue" will last until she ends her Pembrolizumab treatments. She also testified that her Pembrolizumab treatments have caused her to experience "depression" and "anxiety." Trial Tr. 30. However, there was no evidence that her Pembrolizumab treatments, and the accompanying side effects from the Pembrolizumab treatments, will continue beyond January 2024 when the treatment ends.

In sum, Ms. Lucenti established that the government's negligence proximately caused her physical and mental injuries discussed above associated with her PET/CT scans, beginning after her thyroidectomy and occurring every three months, and those associated with her Pembrolizumab treatments, beginning in January 2023 and lasting until January 2024.

**b.  Findings Regarding Medical Disputes**

**i.  Risk for a Metastasis to a Second Site and Reduced Life Expectancy**

A central issue at trial was whether, in addition to the metastasis to the thyroid, a second metastasis to a site in the body other than the thyroid was likely. Dr. Dinesh Singh, an expert in urology, who testified on behalf of the plaintiff, and Dr. Mitchell Benson, an expert in urologic oncology, who testified on behalf of the government, agreed that, were Ms. Lucenti to have another

9

metastasis, it was highly likely that her life expectancy would be reduced to five years.  The issue in dispute emerged from their starkly different testimony concerning the likelihood of a second metastasis.

Dr. Singh, a highly credentialed and experienced doctor, was both entirely credible and persuasive.  He testified that "she's at very high risk for her cancer coming back."  *Id.* 135.  Specifically, he testified that, to a reasonable degree of medical certainty, there is an approximately 90% chance that Ms. Lucenti's renal cell carcinoma has metastasized to another site in the body other than the thyroid.  According to Dr. Singh, when the tumor was 2.1 centimeters in size, her cancer was at Stage I, which is "almost entirely a curable cancer" and has an approximately 95% cure rate.  *Id.* 127.  However, he testified, as "that tumor was allowed to grow in place, it developed the machinery, the mechanisms, the mutations, the changes in its DNAs that allows it to become metastatic.  And so when they operated on the patient in 2018 to remove that left kidney . . . it was actually too late" because the cancer had already metastasized.  *Id.* 127.

Once Ms. Lucenti's kidney cancer metastasized to the thyroid, it became a Stage IV cancer, and the cure rate for Stage IV renal cell carcinoma is "the inverse."  *Id.* 128.  Dr. Singh testified that "generally 90% of patients with Stage IV kidney cancer will die within five years" because the cancer metastasizes to multiple other sites in the body.  *Id.* 132.  Specifically, he testified that Stage IV kidney cancer is a "cancer that consumes, it's usually a cancer that goes into multiple areas, and the patients kind of waste away and die . . . [t]hey become very cachectic and they start to - - their organs start to shut down."  *Id.* 135.

Dr. Singh based his testimony upon his own medical knowledge, years of experience in the field, and his review of "National Cancer Institute, American Cancer Society, [and] hundreds of scientific publications that have come out over the years" that support such a statistic, including

scientific publications that Dr. Singh noted were relied upon by Dr. Benson.  *Id.* 132, 135–36.  Dr. Singh explained that it "goes against common sense, logic, statistics, to believe that just one cancer cell made it out of the kidney and happened to land in the thyroid and three years later it's metastatic only in the thyroid."  *Id.* 143.[3]

Further support for his conclusion is found, as Dr. Singh observed, in the fact that Ms. Lucenti's treating doctor, Dr. Singal, is treating the likelihood that there are other cancer cells elsewhere in her body with Pembrolizumab.  Dr. Singh testified that Pembrolizumab is not used as a "preventative medication" but to "treat" cancer cells because of its "known toxicity" and harmful side effects.  *Id.* 154.  Nor, Dr. Singh testified, would Ms. Lucenti's treating doctors be "doing so many" PET/CT scans if they believed she was cured of her cancer; they are subjecting Ms. Lucenti to PET/CT scans every three months because they know that there are likely cancer cells elsewhere in her body, and they want to find a tumor "at the earliest recurrent size when it comes up."  *Id.* 143–44.

Dr. Singh testified that Ms. Lucenti's five-year life expectancy begins from the "discovery of the metastasis" to the thyroid.  *Id.* 129.  Based on Dr. Singh's testimony, because the thyroid metastasis was "discovered" in August 2022, Ms. Lucenti has a five-year life expectancy of August

---

[3] The government's argument that Dr. Singh's testimony should be completely rejected as insufficiently supported by medical expertise is completely at odds with the record.  In addition to Dr. Singh's educational and training credentials as described in footnote 1 above, he is familiar with the medical literature on kidney cancer; has received honors and awards for his oncology research; and has himself published numerous articles on kidney cancer.  Indeed, his most recent publication addressed the use of CT scans to diagnose kidney cancer and how to use the images to better predict which cancers are progressive and which are not.

The government goes so far as to mock Dr. Singh's reliance on logic.  But the government offers no scientific or evidentiary basis for doing so.  Rather, it is indisputable that logic is a part of the scientific method.

2027.[4] This is in stark contrast to the average life expectancy of a woman of Ms. Lucenti's age in 2015 when her tumor was "almost [an] entirely [] curable cancer." *Id.* 127. Then, her life expectancy was 2039, a difference of twelve years.[5]

In contrast to Dr. Singh, Dr. Benson, for the government, testified that, to a reasonable degree of medical certainty, following her thyroidectomy, Ms. Lucenti is now "cancer free;" a metastasis to another site in her body is unlikely; and she has a high chance of survival over the next five years. *Id.* 309. Dr. Benson based his opinion principally on the fact that no PET/CT scan that Ms. Lucenti has undergone since her thyroidectomy has detected a further metastasis and on an assumption about the growth rate of Ms. Lucenti's cancer.

As was elicited at trial, Dr. Benson similarly opined in a January 2022 expert report that Ms. Lucenti's left kidney cancer was not likely to metastasize from the kidney to any other site in her body, including the thyroid, before it did, in fact, metastasize to the thyroid. Specifically, in 2022, Dr. Benson opined, "I can unequivocally state within a reasonable degree of medical certainty that this three-year delay had no adverse impact upon her ultimate treatment, her

---

[4] The government suggests that the plaintiff's five-year life expectancy — if accepted — should begin from the date that Ms. Lucenti had a biopsy taken of her thyroid at VAMC West Palm Beach in September 2021, rather than from the date that the metastasis was discovered at UMMC in August 2022. The government's suggestion is contrary to Dr. Singh's testimony, which I accept, that the five-year life expectancy begins from the "discovery of the metastasis." Dr. Singh did not testify that life expectancy begins from the date that the test was taken leading to the discovery of the metastasis, as would support the government's suggestion, or from the unknowable date that the cancer metastasized to the thyroid.

[5] Ms. Kucsma's testimony to this effect was based on the National Vital Statistics Report which the federal government publishes. Although the government raised questions about applying these statistics to Ms. Lucenti, I found Ms. Kucsma's testimony on this issue to be credible and convincing. Moreover, the government offered no evidence from which to determine any lower life expectancy had Ms. Lucenti been properly diagnosed in 2015.

12

prognosis, or any correlation with her current complaints." *Id.* 311.  On direct examination, in

explaining that incorrect opinion, he stated:

> [S]he had no evidence of disease.  And so based upon that, I thought
> that the delay in treatment was not going to adversely affect her.
> Obviously, in retrospect, that was not correct.  I mean, she developed
> a thyroid metastasis.

*Id.* 293–94.  Despite this acknowledgment, Dr. Benson now relies on the same reasoning as he did

in his January 2022 opinion.  On direct examination, he testified that Ms. Lucenti's cancer is

unlikely to metastasize to a site in her body other than the thyroid because the "thyroid metastasis

was removed and we have no evidence of disease." *Id.* 294.  However, Dr. Singh cogently

explained why the lack of current evidence of a metastasis is not determinative as to whether Ms.

Lucenti is highly likely to have a metastasis to another site in her body, namely, that the cancer

cells are still too small in number to be detected on the scan.

Dr. Benson's opinion did not adequately account for the fact that Ms. Lucenti's treating

doctors have advised her to undergo PET/CT scans every three months and to have Pembrolizumab

treatments despite the anxiety Ms. Lucenti feels before and during the scans and the harmful side

effects of the Pembrolizumab treatments.  On the one hand, Dr. Benson was dismissive of her

Pembrolizmuab treatments, describing the treatments as merely "prophylactic." *Id.* 296.  On the

other hand, Dr. Benson testified that Pembrolizmuab treatments are given only to "patients like

Ms. Lucenti" who are "at an increased risk for cancer recurrence," and the treatments work by

making tumor cells visible to T cells in the body so that the tumor cells "can be destroyed." *Id.*

284, 288.  Dr. Benson did not satisfactorily explain why Ms. Lucenti's doctors would treat her with

a drug with harmful side effects that enables her body to identify cancer cells if Ms. Lucenti is

"cured of her metastatic kidney cancer." *Id.* 296.

Dr. Benson also testified that Ms. Lucenti was unlikely to have a further metastasis because her cancer grew at the same rate in the kidney and the thyroid and, thus, her cancer would be growing at the same rate if it was elsewhere in her body and would already be detectable on a PET/CT scan.  This opinion is not credited.  To begin with, if that were the case, there would be no reason for her treating doctors to have her continue to undergo PET/CT scans every three months.  Additionally, on cross-examination, when asked whether it was possible that Ms. Lucenti's kidney cancer metastasized to the thyroid in 2015, he testified, "We have no evidence that it had metastasized, but it could have been metastasized with one cell in 2015 . . . [w]e have no way of knowing whether that metastasis occurred."  *Id.* 304.  Dr. Benson did not adequately explain how he can opine on the growth rate of Ms. Lucenti's cancer in the thyroid while also testifying that he does not know when her cancer began growing there.  Nor did Dr. Benson adequately square his testimony that the growth rate for Ms. Lucenti's cancer would be the same in any part of her body, including the kidney, thyroid, and another site in her body, while also testifying, as he did, that metastasis growth rates are "variable based upon the site of metastasis." *Id.* 334.[6]

Ultimately, the issue is which doctor gave the most well-supported and credible evidence. For all of the reasons described above, as well as my observations of the witnesses, insofar as Dr. Benson's testimony conflicted with that of Dr. Singh, it is rejected.  Ms. Lucenti has shown, by a

---

[6] The government argues that the removal of the thyroid metastasis is a reason to discount Dr. Singh's testimony as to Ms. Lucenti's five-year life expectancy, but the medical dispute was not over whether there would be a metastasis from the thyroid to another part of her body, but over the likelihood of further metastases from the kidney itself before its removal in 2018.  The government also argues that Dr. Singh's testimony should be discounted because he did not consider her immunotherapy treatments as reducing the likelihood of further recognizable metastases.  But Dr. Singh, when he expressed his opinion as to Ms. Lucenti's life expectancy, was fully aware that she was receiving immunotherapy.

preponderance of the evidence, that her cancer is highly likely to metastasize to a site in her body other than the thyroid and that she has a five-year life expectancy from the "discovery of the metastasis" to the thyroid, which was in August 2022, resulting in a life expectancy of August 2027. She established that this prognosis, which the government's missed diagnosis proximately caused, is a far worse prognosis than had the kidney cancer been properly diagnosed in 2015.

### ii.  Total versus Partial Nephrectomy

Another issue that was in dispute at trial was whether the government's negligence proximately caused Ms. Lucenti to have a total nephrectomy on her left kidney, as opposed to a partial nephrectomy, had her left kidney cancer been properly diagnosed in 2015. Dr. Singh and Dr. Benson offered contrasting testimony on this issue as well. Dr. Singh testified that, in 2015, when the mass was 2.1 centimeters, Ms. Lucenti could have had "nephron-sparing surgery," or "NSS." *Id.* 130. NSS removes the tumorous part of the kidney and saves the rest. Dr. Singh testified that alternatively Ms. Lucenti could have had cryoablation, as she had had on her right kidney. Dr. Singh explained that, when a tumor is smaller, it is possible to remove "just that small portion of the kidney or do cryoablation and freeze that portion of the kidney," but once the tumor grows large, it is not possible to remove it without taking out the whole kidney. *Id.* 132. He added that the fact that Ms. Lucenti had cryoablation on the 3 centimeter tumor in her right kidney further supports his opinion that she could have had NSS or cryoablation on her left kidney when the tumor was 2.1 centimeters.

In contrast, Dr. Benson testified variously that in 2015 NSS would have been within the standard of care; was not possible given the location of her tumor in relation to her left renal artery; and was possible but not the best treatment for Ms. Lucenti. He also testified that cryoablation would not have been proper because it does not always result in the destruction of all tumor cells.

15

As discussed above with respect to their opinions about Ms. Lucenti's prognosis, I have already found that Dr. Singh was a far more reliable and credible witness than Dr. Benson, and on this issue as well, I credit Dr. Singh.  Among other things, as was elicited on cross-examination, at his deposition, Dr. Benson testified that he did not have an opinion about whether she could have undergone a partial nephrectomy in 2015 because "I don't know if she would have been able to." *Id.* 300.  His explanation as to how he developed an opinion for the trial, but did not have one before, was that he had not been asked at his deposition if the tumor would have been "best treated" with a partial nephrectomy.  *Id.* 301.  This was an example of the equivocating nature of his testimony.

In sum, I credit Dr. Singh's testimony and find that Ms. Lucenti could have had NSS or cryoablation and saved a portion of her left kidney had she been properly diagnosed in 2015 and that the government's delay in diagnosis was the proximate cause of her need to have a total nephrectomy in 2018.

### iii.  Chronic Kidney Disease

Chronic Kidney Disease ("CKD") is a disease in which an individual loses kidney functioning, which results in the inability of the kidneys to excrete toxins and the build-up of toxins in the body.  CKD is measured in five stages which correspond to the progressive loss of kidney functioning.  The most serious form of CKD is Stage 5 or end-stage renal disease.  Dr. Singh testified credibly on this issue on behalf of the plaintiff, and Dr. Neugarten testified credibly on behalf of the government as an expert in the field of nephrology.  They agreed that Ms. Lucenti had CKD and that her CKD was currently at Stage 3 based on the level of her kidney function in

her remaining, but compromised, right kidney.[7]  Dr. Neugarten testified that, had Ms. Lucenti been properly diagnosed in 2015 and undergone a partial nephrectomy, rather than a total nephrectomy, she would have had improved kidney functioning, but still would have had Stage 3 CKD.  The plaintiff offered no evidence to the contrary.  I accept Dr. Neugarten's conclusion.

Both doctors also spoke to the serious consequences that could occur if Ms. Lucenti's kidney functioning were to worsen to end-stage renal disease.  Dr. Singh testified that end-stage renal disease requires a patient to have dialysis and/or a kidney transplant.  Dr. Neugarten spoke to the "severe consequences" that accompany end-stage renal disease, including requiring "dialysis to maintain life" and a significant increase in the risk of "cardiovascular mortality."  *Id.* 377–78. However, Dr. Neugarten testified that Ms. Lucenti's current Stage 3 CKD is "not associated with any symptoms specifically related to kidney disease" and that she was not likely to develop such symptoms in the future.  *Id.* 364.  This evidence was not contradicted.  Accordingly, while the government's negligence proximately caused Ms. Lucenti to lose kidney functioning, it was not established that there were any physical symptoms associated with her Stage 3 CKD.  However, as discussed further below, Ms. Lucenti did establish that she has mental distress associated with her Stage 3 CKD because of the total loss of her left kidney.

### c.  Findings Regarding Other Results of the Delayed Diagnosis

The government's negligence proximately caused the plaintiff to suffer from mental health symptoms that were caused by concerns about her renal cell carcinoma diagnosis.  As early as July 2018, after she learned that she may have renal cell carcinoma, Ms. Lucenti, herself an RN, "had

---

[7] The parties' experts had a disagreement as to whether her CKD was Stage 3A or Stage 3B.  I conclude that she has Stage 3A CKD, as Dr. Neugarten testified, based on his review of her most recent test results.

questions regarding possible metastasis and knowledge if any was present prior to removal of the tumor" and "wanted to see oncology to discuss metastasis work up." Ex. B, at 0428.  In 2019, Ms. Lucenti reported "anxiety symptoms related to medical issues especially renal cell carcinoma and fears of the cancer returning," *id.*, at 0044, and "more depressive and anxiety symptoms related to being diagnosed with renal cell carcinoma and reports that she had her left kidney removed." *Id.*, at 0188.[8]  Additionally, the government's negligence proximately caused the plaintiff to suffer from, and continue to suffer from, mental health symptoms that were caused by concerns about the diagnosis of the metastasis to her thyroid.  Ms. Lucenti's Stage IV renal cell carcinoma diagnosis has left her, in her words:

> [S]cared to death because I have the highest stage of cancer that you can possibly have. There is nothing higher than Stage IV and that's what I have, Stage IV.  So it makes me anxious, depressed, scared, insecure, uncertain of the future, uncertain if I have a future . . . beyond today I'm not sure what's going to happen because I have Stage IV and to the best of my knowledge, knowing that Stage IV can metastasize anywhere in my body at any time and so that can happen at any time.

Trial Tr. 32.

Ms. Lucenti testified that the "best [her treating doctors] can give" her is that they are "hopeful" that she will have "at least five years cancer free" after her Pembrolizumab treatments conclude. *Id.*  She further testified that the Stage IV diagnosis has left her in "a state of feeling very unsure and very insecure because [she is] insecure as to how [she] can take care of [herself]." *Id.* 34.  She has "plenty of fears," among them that she is "going to go to bed and not wake up"

---

[8] I have considered that Ms. Lucenti potentially could have experienced mental health symptoms about her renal cell carcinoma diagnosis, including fears that her cancer would return, even if she had been properly diagnosed in 2015.  However, after her three-year delayed diagnosis and the growth of her cancer mass from 2.1 centimeters to 6.8 centimeters, it is reasonable to infer that her mental distress about her diagnosis and fears that her cancer would return (which, indeed, did occur) were of a different order of magnitude, than if, for example, she had undergone a partial nephrectomy in 2015 and had a 95% likelihood that her cancer was cured.

and "die in [her] sleep." *Id.*  Finally, knowing that she had a three-year delayed diagnosis that caused a metastasis to her thyroid, she fears an "impending death" "[e]very day." *Id.* 35.  Such fears will last her the rest of her life.

Medical records support Ms. Lucenti's testimony that she experienced mental distress because of her Stage IV renal cell carcinoma diagnosis.  At a "Whole Health" appointment, in June 2023, in answering a question about what "really matters" to her in relation to her life's "mission, aspiration, and purpose," Ms. Lucenti reported:

> I was diagnosed with renal cell carcinoma.  I lost one of my kkidneys (sic) and my thyroid.  I have gained so much weight.  I am feeling depression, I don't feeling well, immunotherapy side effects, I don't want to medication for depression, I am pain 24/7 (I am less mobile and gardening).  The pain patches help only so much.

Ex. B., at 3528.  And, on August 8, 2023, Ms. Lucenti sought to make an appointment with a mental health professional, reporting "experiencing some constant depression and anxiety regarding my cancer diagnosis and treatment." *Id.*, at 3508.

Ms. Lucenti has sought to cope with her mental health symptoms relating to her Stage IV renal cell carcinoma diagnosis in various ways.  She has tried therapies, including speaking with social workers, attending holistic and aroma therapies, meditating, and belonging to a cancer support group.  At the cancer support group, Ms. Lucenti discusses "how the cancer makes us feel" and "coping skills to get through the day when we're feeling fatigued and anxious."  Trial Tr. 34.

The government's negligence also proximately caused Ms. Lucenti to experience mental health symptoms relating to her Stage 3 CKD diagnosis.[9]  She testified that she fears that her CKD

---

[9] Although the government put forth evidence that Ms. Lucenti would have had Stage 3 CKD, even if she had been properly diagnosed in 2015, her fears regarding her Stage 3 CKD were proximately caused by the government's negligence because they stem from the fact that she had a total nephrectomy, which I found that the government's negligence proximately caused, rather than a partial nephrectomy.  Ms. Lucenti explained that her fears associated with her Stage 3 CKD stem from the fact that she has only "one kidney to rely on."  Trial Tr. 35.

will "lead to end stage renal failure" because she only has "one kidney to rely on," and if she picks up "any kind of cold or flu or now COVID that [she's] not going to be able to recover from it." *Id.* 34–35. Such fears, which began following her total nephrectomy in August 2018, will also last the rest of her life.

Ms. Lucenti also established that the government's negligence proximately caused her enjoyment of life to worsen while she experiences side effects from her Pembrolizumab treatments. Ms. Lucenti testified that she does not "go out with [her] coworkers." *Id.* 33. She explained that she has "missed a lot of celebrations and parties at work because it's too embarrassing to excuse myself if I became nauseous and I have to go to the bathroom to throw up." *Id.* She also testified that she sometimes does not go grocery shopping because she is afraid she will become nauseous.

Although the evidence was that her nausea was limited to her first two Pembrolizumab treatments, that limitation does not apply to her testimony regarding her fatigue. That fatigue, which adversely affected the enjoyment of her life, was a side effect of her Pembrolizumab treatments and caused by the government's negligence. It takes her longer to clean her house; she can do "a little bit" and then she must "rest for a little while." *Id.* 32–33. She "can no longer do gardening or yard work." *Id.* Sometimes, she does not have "energy" to cook dinner, take a shower, or take care of her own hygiene. *Id.* 33. Accordingly, the government's missed diagnosis proximately caused Ms. Lucenti's inability to engage in these activities, which began at the start of her Pembrolizumab treatments in January 2023 and will last until the side effects from her Pembrolizumab treatments end in January 2024.

The government notes that Ms. Lucenti reported to a VA social worker, to whom she had been referred by the psychiatry department, in March 2021, that she "enjoys baking, cooking, and

in the past was taking a couple of classes with her sister, including cake decorating and stained glass," Ex. B, at 2467, and in May 2021, that she "continues to engage in consistent physical activity at least 5 days a week, including walks, and stationary bike." *Id.*, at 2403.  To the extent that the government argues that these reports show that the plaintiff's "claimed inability to care for herself or her home is not supported by the record," Def.'s Br. 60, this argument is rejected. The government ignores that these reports pre-dated her Stage IV renal cell carcinoma diagnosis and her Pembrolizumab treatments, and they do not detract from how the Pembrolizumab treatments impacted her enjoyment of life.  If anything, they support the treatments' detrimental effect by showing Ms. Lucenti's enjoyment of life before those treatments began.

I note that some of the mental health symptoms from which the plaintiff has suffered, and will continue to suffer, were not proximately caused by the government's negligence.  Instead, they were connected to job losses, her military service and concerns about her adult son, who has been arrested several times and had an opioid and heroin drug addiction.  In 2012 and 2016, in therapy sessions at the VAMC Northport, the plaintiff reported mental health symptoms, including anxiety and depression, relating to concerns about her son.  In March 2017, Ms. Lucenti reported to the VAMC that she felt depressed and anxious because of concerns about her son and her finances after the recent "loss of 2 employments."  Ex. B., at 0566.  In June 2017, she also reported to a VAMC Northport social worker that she made the decision "to file for early retirement and disability;" she also reported that she had a "bad panic attack while at work" relating to a memory about her military service that contributed to that decision.  *Id.*, at 0536.  Around that time, she also reported to the VAMC Northport that she was unable to work because of her mental health symptoms and would consider a return to part-time work in the future.

The plaintiff applied for social security disability benefits and VA disability benefits for mental health symptoms that were not proximately caused by her cancer diagnosis. In April 2017, Ms. Lucenti applied for social security disability benefits, noting as part of the application that she stopped working in February 2017 because she "was terminated because [she] could not safely and properly perform" her job duties. Ex. E., at 0013. She listed "severe depression" as the physical or mental health condition that limited her ability to work and noted that the condition "became severe enough" to keep her from working as early as January 2016. *Id.* In 2017, the plaintiff received social security disability benefits, but withdrew her claim for such benefits later in 2017. In October 2018, Ms. Lucenti applied for VA disability benefits for PTSD "also claimed as anxiety and insomnia" that was connected to her military service. Ex. I, at 0112. As part of that application, she had a psychiatric examination in which she reported that, because of "her panic, depression, and other PTSD symptoms," she felt "no longer capable of handling the rigors and responsibilities of nursing." *Id.*, at 1086. Ultimately, in May 2019, she was awarded VA disability benefits that were determined, under the VA's evaluation criteria, to be "100 percent disabling." *Id.*, at 1071.

Ms. Lucenti also had other physical and mental injuries that she did not establish were proximately caused by the government's missed diagnosis. She had "back pain," "right shoulder" pain, "chronic neck pain" and arthritis in her back, shoulder and arms, which was unrelated to her renal cell carcinoma, that she testified "contribute to [her] inability to perform some of [her] activities of daily living." Trial Tr. 98–99. The record also contained other evidence of "fatigue" and difficulty socializing that Ms. Lucenti did not establish was related to her renal cell carcinoma. For example, in 2019, the medical records note that Ms. Lucenti "continues to gain weight causing fatigue," Ex. B, at 0172, and, in 2022, Ms. Lucenti reported that she needed to get her "calcium

level under control," because it was causing her to experience "extreme fatigue and general malaise." *Id.*, at 2681–82.  Additionally, before she began her Pembrolizumab treatments, Ms. Lucenti reported difficulty socializing.  For example, as part of her VA disability benefits application, in connection with mental health symptoms that were caused by her military service, she reported that she "feels incapable of making or keeping new friendships, and has a very limited social life." Ex. I, at 1086.[10]

### d.  Findings Regarding Work History

The plaintiff began working at Peconic Landing, which is a skilled nursing facility in New York, as an RN around 2012.  She worked at Peconic Landing until "around" 2016 or 2017.  Trial Tr. 37.  In addition to Peconic Landing, she also held jobs at other nursing facilities.  In 2016 and in February 2017, Ms. Lucenti was terminated from two jobs.  At some point in 2017, she stopped working.  As a result of her social security disability benefits application, in 2017, she received $12,882 in social security disability benefits.  The plaintiff returned to work in late October 2017.  She returned to work at Peconic Landing in 2018 but stopped working there around February 2019.  She started work at a different nursing facility around that time but stopped working again in March 2019.  As a result of her VA disability benefits application, beginning around June 2019, Ms. Lucenti has received about $36,000 per year in VA disability benefits and, since around December

---

[10] In addition to the non-compensable injuries described in the text, I note that I agree with the government that Ms. Lucenti did not show that her "flu"-like symptoms that she experienced around March 2019 — specifically, that she "felt sick every day like I had the flu," Trial Tr. 38 — were proximately caused by the government's negligence.  Expert testimony is necessary to establish proximate cause, except as to matters within the ordinary experience and knowledge of laymen.  *Gonzalez v. United States*, 612 F. Supp. 3d 336, 345 (S.D.N.Y. 2020), *aff'd*, 80 F.4th 183 (2d Cir. 2023).  Ms. Lucenti did not offer expert testimony linking her "flu"-like symptoms to her renal cell carcinoma.  By contrast, the other injuries that I have found the government's negligence to have proximately caused were either supported by Dr. Singh's testimony or are matters within the experience and observation of an ordinary person.

2022, about $43,000 in VA disability benefits.  In 2021 and 2022, Ms. Lucenti also received $25,008 and $26,484 in social security benefits, respectively.

Ms. Lucenti impressed me as wanting to and trying to work whenever possible, despite her medical issues.  In her VA disability benefits application noted above, Ms. Lucenti reported that she "hopes to find relief for her symptoms and impairment, and return to work, as she tells of having worked 'incredibly hard and long' to become a nurse, and planned to work until at least 72 years of age."  Ex. I, at 1086.  After not working since March 2019, she "restarted" work in May 2021 as an RN at South County Mental Health Center ("SCMHC") in Florida after her move there from New York.  Trial Tr. 39.  She has worked at SCMHC from May 2021 until the date of the trial as a "per diem employee," meaning she can work "as much" or "as little" as she can tolerate. *Id.* 40.  At SCMHC, Ms. Lucenti earns $40 per hour and, on days she works, works about eight hours per day (totaling $320 per day).  In 2022 and 2023, until September 2023, she was working about two to three days per week.  Since October 2023, she can work only one day per week because of her Stage IV renal cell carcinoma diagnosis and side effects from her Pembrolizumab treatments that have made her feel "too sick to go into work."  *Id.*  In October 2023, she did not work at all, and in November 2023, she worked one day per week.[11]  Ms. Lucenti plans to work until she reaches the age of 72, which is on September 24, 2026.[12]

---

[11] The government points to certain of Ms. Lucenti's time sheets at SCMHC from May 2021 to March 2022 that it argues do not support Ms. Lucenti's testimony that she has, until recently, been working two to three days per week at SCMHC.  However, Ms. Lucenti's 2022 W-2 showed that she earned $41,480 in wages, and her pay stub from SCMHC in 2023 showed that she earned $38,495 in wages from January 2023 to the end of September 2023, which are both consistent with her testimony that she was working about two to three days per week.

[12] The government notes that Ms. Lucenti reported, in 2017, that she planned to retire early and, around that time, reported difficulty continuing to work.  However, Ms. Lucenti "restarted" work in May 2021, and, while she may no longer intend to work full-time, I find that she intends to work part-time, as much as her health will allow, until her anticipated retirement.

Based upon all the evidence in the record, I conclude that the limitations on Ms. Lucenti's ability to work, which began in October 2023, were caused not only by the Pembrolizumab treatments' side effects, but by the mental distress arising from her Stage IV metastatic cancer diagnosis.  Thus, I find that such limitations will last until her retirement on September 24, 2026 and will not end in January 2024 when the Pembrolizumab treatments end.

## IV.   Conclusions of Law

### a.  Legal Standards

"The FTCA makes the United States liable for certain tort claims, including medical malpractice, committed by federal employees as determined by state law."  *Gonzalez v. United States*, 612 F. Supp. 3d 336, 345 (S.D.N.Y. 2020), *aff'd*, 80 F.4th 183 (2d Cir. 2023); *see* 28 U.S.C. §§ 1346(b), 2674.  "To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries."  *Gonzalez*, 612 F. Supp. 3d at 345.  To establish the latter element, "a plaintiff must demonstrate that the defendant's deviation from the standard of care was 'a substantial factor in bringing about the injury.'"  *Id.* (quoting *D.Y. v. Catskill Reg'l Med. Ctr.*, 156 A.D.3d 1003, 1005 (3d Dept 2017)).  "The plaintiff must prove each of these elements by a preponderance of the evidence."  *Id.*

Once liability is established, "a plaintiff may recover his loss of earnings, medical expenses, and mental and physical pain and suffering."  *Id.* at 348.  However, "causation issues are relevant both to liability and to damages."  *Oakes v. Patel*, 20 N.Y.3d 633, 647 (2013).  "[E]ven where liability is established, the plaintiff may recover only those damages proximately caused by the malpractice."  *Id.*; *accord Carroll v. United States*, 295 F. App'x 382, 386 (2d Cir. 2008).

**b.  Proximate Cause as to Liability and Damages**

As noted, prior to trial, the government "stipulated that the generally accepted standard of medical practice was to follow up on the subtle hypodensity in the medial pole of Plaintiff's left kidney seen on Plaintiff's July 3, 2015 abdominal/pelvic CT scan by, after appropriate therapy, conducting imaging of Plaintiff's kidneys using renal mass protocol, and that it was a departure from that standard when that follow up imaging was not done until July 19, 2018." JPTO, at 3.  It also stipulated "that the aforementioned departure from the standard of care was the proximate cause of metastatic renal cell carcinoma to Plaintiff's thyroid." *Id.*

Based upon these stipulations and the Findings of Fact set forth above, I conclude that the plaintiff has established that the defendant is liable for its delayed diagnosis of her renal cell carcinoma and that this delay proximately caused a wide range of injuries, including physical and mental pain and suffering and lost past and future wages.  The physical and mental injuries that the government proximately caused Ms. Lucenti are detailed in the Findings of Fact set forth above.  The economic damages that the government proximately caused Ms. Lucenti, based upon the above Findings of Fact, are detailed in the calculation of the economic damages award set forth below.

As evident from the discussion above, in my Findings of Fact, I recognize that Ms. Lucenti had physical and mental health symptoms that she did not establish were related to her renal cell carcinoma diagnosis.  As a result, a part of the mental distress and physical injuries suffered by the plaintiff, including a part of the damage to her enjoyment of her life, was caused by factors other than the defendant's negligence. *See Mathie v. Fries*, 121 F.3d 808, 815 (2d Cir. 1997).  Any mental or physical injuries or conditions, including any that affected her enjoyment of life, that

were not caused by the defendant's negligence are not considered in making my award.  *See Carroll*, 295 F. App'x at 386; *Mathie*, 121 F.3d at 815.[13]

### c.  Calculation of Award

Ms. Lucenti seeks damages for mental and physical pain and suffering, including loss of enjoyment of life, and economic damages for loss of earnings and loss of household services.[14] Ms. Lucenti's pain and suffering and economic damages are addressed in turn.

### i.  Pain and Suffering Award

Recovery for noneconomic losses such as pain and suffering "rests on the legal fiction that money damages can compensate for a victim's injury.  We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong."  *McDougald v. Garber*, 73 N.Y.2d 246, 254 (1989) (internal quotation marks omitted).  The measure of damages for pain and suffering "is fair

---

[13] Ms. Lucenti's cancer-caused physical and mental injuries were not, as in *Neel v. Mount Sinai Hosp.*, 762 N.Y.S.2d 224 (1st Dept 2003), relied upon by the government, "secondary" to an "underlying . . . disorder"; rather, the physical injuries and mental distress Ms. Lucenti experienced relating to her delayed cancer diagnosis were distinct from her physical and mental injuries that were caused by factors other than the government's negligence.

[14] Insofar as the plaintiff also seeks damages for "loss of a chance of cure," that is an approach to analyzing causation, not a separate category of damages, which "permits plaintiffs to recover damages for the reduction in the odds of recovery."  *Mann v. United States*, 300 F. Supp. 3d 411, 422 (N.D.N.Y. 2018) (internal quotation marks omitted).  And insofar as the plaintiff seeks to rely on the lost chance of cure doctrine to establish proximate cause, resort to it is unnecessary in this case.  The government stipulated that its negligence was the proximate cause of the metastasis of the renal cell carcinoma to the plaintiff's thyroid, and I have accepted Dr. Singh's testimony that such negligence proximately caused the plaintiff's prognosis to worsen from a 95% chance of cure in 2015 to an approximate 90% chance that she has a five-year life expectancy from the discovery of her metastasis.  *See id.* at 423; *see also* 14 Lee S. Kreindler et al., New York Law of Torts § 8:21 (Aug. 2023 Update) (stating that "when the lost chance of a cure is a substantial one, say a 90 percent chance of a cure, no one would dispute that the plaintiff has met his or her burden to establish a prima facie case that the defendant's negligence resulted in the patient's death or incurable condition.")

and reasonable compensation to be fixed by the trier of fact in the light of all the evidence in the case." *Gonzalez*, 612 F. Supp. 3d at 349. While "not a separate element of damages deserving a distinct award," included within damages for pain and suffering is loss of enjoyment of life. *Nussbaum v. Gibstein*, 73 N.Y.2d 912, 914 (1989). Such damages broadly "encompass the frustration and anguish caused by the inability to participate in activities that once brought pleasure." *McDougald*, 73 N.Y.2d at 257.

No bright line formula exists to determine an appropriate pain and suffering award. As the Second Circuit explained in *Gonzalez v. United States*, 80 F.4th 183 (2d Cir. 2023), "personal injury awards, especially those for pain and suffering, are subjective opinions which are formulated without the availability, or guidance, of precise mathematical quantification." *Id.* at 196. Factors "to be considered in evaluating such awards include the nature, extent and permanency of the injuries, the extent of past, present and future pain and the long-term effects of the injury." *Id.* at 197. In *Gonzalez*, an FTCA action involving the VA's negligent failure to diagnose lung cancer, the Second Circuit held that the district court adequately considered such factors by: comparing the plaintiff's condition prior to and following his cancer diagnosis; considering the severity of the cancer treatment; evaluating the "delay in, and worsened prognosis of," the plaintiff's cancer; and determining the length of time he suffered from the time of his diagnosis until his death. *Id.* The Second Circuit also noted, approvingly, the district court's consideration of three "awards issued in comparable New York cases involving a failure to diagnose lung cancer because they 'provide some guidance.'" *Id.* (quoting *Gonzalez*, 612 F. Supp. 3d at 349).

I have considered the factors that the Second Circuit approved in *Gonzalez*. Below, I summarize the evidence, described in more detail in the Findings of Fact, as to such factors.

As to a comparison of Ms. Lucenti's condition prior to and following her cancer diagnosis and as to the severity of the cancer treatment, Ms. Lucenti has experienced, and will experience, a range of physical and mental injuries arising from the government's negligence that she did not experience before, including thyroidectomy and treatment for, and monitoring of, her metastatic cancer. Beginning in July 2018, Ms. Lucenti was "consistently not feeling well." Trial Tr. 22. She presented to the VAMC Northport emergency department with "lower abdominal pain, nausea, chills," "dizziness," and "blood in the toiliet" (sic). Ex. B, at 0450. When she learned that, in three years, the 2.1 centimeter mass had become a 6.8 centimeter mass, and that it was renal cell carcinoma, she experienced great mental distress, including concerns about whether her cancer had metastasized. Her mental pain and suffering intensified dramatically when Ms. Lucenti learned that her renal cell carcinoma had, indeed, metastasized to her thyroid and that she had Stage IV renal cell carcinoma. Since the metastasis, Ms. Lucenti worries that she may "die in [her] sleep" and fears an "impending death" "every day." Trial Tr. 34–35. She was "scared to death" to have the thyroidectomy because they told her "that the nodule was huge, and it was very risky surgery." *Id.* 28. The surgery caused her great pain, and she suffered from nausea and vomiting from the anesthesia. Every three months, Ms. Lucenti must undergo PET/CT scans to detect any further metastases in her body. These cause her anxiety and discomfort. Although Ms. Lucenti had long-term mental health symptoms stemming from her military service, job losses, and concerns about her son, the severe mental distress from her cancer diagnosis and her shortened life expectancy (discussed below) is distinct from those symptoms.

Ms. Lucenti has also endured immunotherapy (Pembrolizumab) treatments from January 2023 until January 2024 and mental distress from her Stage 3 CKD diagnosis. The Pembrolizumab treatments are administered approximately every three weeks in a hospital setting. Ms. Lucenti

has experienced a variety of symptoms, including nausea and worsening fatigue, as well as depression and anxiety from these treatments.  Ms. Lucenti's enjoyment of life has worsened because of the treatments' side effects.  Those side effects have interfered with a range of life activities, including her ability to care for basic physical needs, such as cooking dinner, showering, and taking care of her own hygiene.  Ms. Lucenti further experienced, and will experience, mental suffering relating to her Stage 3 CKD, including fears that her CKD may worsen to end stage renal failure because she has only one kidney remaining.

As to the delay in, and worsened prognosis of Ms. Lucenti's renal cell carcinoma, in 2015, when her mass was 2.1 centimeters in size, Ms. Lucenti had a 95% chance of being cured of cancer. As a proximate result of the government's three-year delay in diagnosing her cancer, she has a five-year life expectancy from the discovery of the metastasis to the thyroid, or a life expectancy of August 2027.  This is a far worse prognosis than had the kidney cancer been properly diagnosed in 2015.  That Ms. Lucenti faces a significant reduction in her life expectancy as a result of the government's malpractice means that she faces the anguish and fear of not knowing, within her shortened life span, when and where the cancer will likely recur.

As to the length of time that she has suffered, and will continue to suffer, Ms. Lucenti endured past physical and mental pain and suffering of varying degrees as described above in my Findings of Fact over a period of more than five years and three months, which covers the period from her physical complaints at the time of her VAMC Northport ER visit on July 19, 2018, which led to a diagnosis of renal cell carcinoma, until November 17, 2023, when the trial ended.  She will endure future physical pain and suffering of two and a half months, which covers the period from the end of the trial until the end of her Pembrolizumab treatments in January 2024, and future

mental pain and suffering of more than three years and eight months, which covers the period from the end of the trial until her August 2027 life expectancy.

In comparable cases, plaintiffs have been awarded a range of damages for pain and suffering. In *Mandel v. New York County Public Administrator*, 29 A.D.3d 869 (2d Dept 2006), a failure to diagnose lung cancer for twenty-nine months led to metastasis requiring chemotherapy and radiation, and ultimately decedent's death twenty-six months after the cancer diagnosis. The jury in 2003 awarded $2,000,000 in pain and suffering. In *Peggy Ann Morgello* v. *Fredric David Harris NY General Surgery PLLC*, 2007 WL 4590558 (Sup Ct, Queens County Dec. 10, 2007) (Verdict Summary), a jury in 2007 awarded the approximately 53-year-old plaintiff $2,000,000 in past pain and suffering and $5,000,000 in future pain and suffering where the approximately one and a half year delay in diagnosis of her breast cancer led to the need for a bilateral mastectomy rather than more conservative surgery and a worse prognosis and decreased life expectancy. There was evidence as to her loss of enjoyment of life and psychological symptoms including her fears of the return of the cancer.

In *Feldman v. Levine*, 90 A.D.3d 477 (1st Dept 2011), the Appellate Division reinstated a $1,200,000 jury verdict in 2008 for pain and suffering of the decedent where an over four-year delay in diagnosis of lung cancer led to multiple metastases and the hastened death of the approximately 54-year-old decedent two months after discovery of the cancer. The over four-year period of pain and suffering was presented as "coughing, wheezing, shortness of breath and back pain as a result of the metastatic cancer." *Feldman v. Levine*, 2008 WL 5688831 (Sup Ct, NY County Nov. 14, 2008) (Verdict Summary). In *Reid v. Bharucha*, 126 A.D.3d 495 (1st Dept 2015), the Appellate Division reduced a jury verdict from $2,400,000 to $2,000,000 for pain and suffering where a five-month delay in diagnosis caused injury consisting of an additional year of cancer

treatment.  In *Luna v. Spadafora*, 127 A.D.3d 933 (2d Dept 2015), a 2011 jury awarded $1,200,000 for past pain and suffering and $3,400,000 for fifteen years of future pain and suffering where a thirteen-month delay in the diagnosis of medullary thyroid cancer caused the plaintiff to undergo more extensive surgery and two otherwise unnecessary surgeries.  The delay caused the cancer to metastasize to the plaintiff's lymph nodes and lung and worsened her prognosis from a ten-year survival rate of 85%-90% to a ten-year survival rate of only 40%-50%.[15]

In *Mann v. United States*, 300 F. Supp. 3d 411 (N.D.N.Y. 2018), an over three-year delay in diagnosis caused the decedent's 70% chance of survival from surgical removal of his lung cancer to become an "essentially untreatable" Stage IV metastatic cancer.  *Id.* at 420.  In his twenty months of survival after his diagnosis, the decedent "endured enormous pain and suffering" from his various treatments and from the "mental anguish of impending death."  *Id.* at 420–21.  After noting decedent's pre-existing depression and mental health problems, the court in 2018 awarded $1,250,000 for his pain and suffering.  In *Gonzalez*, discussed above, the Second Circuit affirmed an $850,000 pain and suffering award by the district court in 2020.  The decedent was 75 years old and in relatively good shape in October 2015 when the VA should have diagnosed his lung cancer.  The ten-month delay in diagnosis subjected him to treatments he otherwise would not have needed, a dramatically limited quality of life and a worsened prognosis.  Had his cancer been

---

[15] In *Luna*, the Appellate Division stated only that the jury awarded $6,800,000 in total damages. In her post-trial brief, Ms. Lucenti states that the jury in *Luna* awarded $1,200,000 and $3,400,000 for past pain and suffering and future pain and suffering, respectively.  Blog posts that appear reliable confirm these statements; one blog post attached the jury verdict itself.  *See* John Hochfelder, *Medical Malpractice Verdict Affirmed in Delayed Cancer Diagnosis Case*, NEW YORK INJURY CASES BLOG (Mar. 31, 2016), https://www.newyorkinjurycasesblog.com/2016/03/articles/medical-malpractice-1/medical-malpractice-verdict-affirmed-in-delayed-cancer-diagnosis-case/.  The government does not dispute these figures.

properly diagnosed, he would have had "a reasonable chance of cure." *Gonzalez*, 80 F.4th at 188. He died just two years after the diagnosis.

Based upon my Findings of Fact and Conclusions of Law as to Ms. Lucenti's injuries that I found were proximately caused by the government's negligence, and after consideration of the pertinent factors and comparable cases, including consideration of inflation in assessing the awards in such comparable cases, *see id.* at 199, I award the plaintiff $1,600,000 for past pain and suffering and $1,200,000 for future pain and suffering.

### ii.  Economic Damages Award

#### 1.  Lost Past and Future Earnings

Under New York law, an award for lost past and future wages must be established "to a reasonable certainty" given the plaintiff's earning capacity both before and after the injury giving rise to the action. *Carroll*, 295 F. App'x at 385.  "Such an award cannot be based on mere conjecture alone." *Id.*  However, neither is "[m]athematical precision" "required in order to establish the '[r]easonable certainty' of lost earnings." *Orr v. Kiamesha Concord, Inc.*, 167 A.D.2d 153, 154 (1st Dept 1990) (second alteration in original) (quoting *Steitz v. Gifford*, 280 N.Y. 15, 20 (1939)).

To establish her lost earnings, the plaintiff relied on the testimony of Kristin Kucsma, who testified credibly as an expert in the field of economics.  However, although Ms. Kucsma presented a reasonable analysis of how to determine the plaintiff's past and future lost wages, her conclusions cannot be relied upon because she did not adequately account for facts that emerged at trial that significantly impacted her analysis.  In calculating Ms. Lucenti's earning capacity were it not for her injuries resulting from her metastatic renal cell carcinoma, Ms. Kucsma assumed that Ms. Lucenti would continue working on a full-time basis as an RN from 2016 to 2026, as she did from

2012 to 2014.  However, facts emerged at trial that cast doubt on Ms. Lucenti's ability to work full-time for reasons that Ms. Lucenti did not establish were related to her renal cell carcinoma diagnosis.  Ms. Lucenti was terminated from two jobs in 2016 and 2017.  She did not work for much of 2017 or from March 2019 to May 2021.  Ms. Lucenti stated on her social security disability benefits application that, as early as January 2016, she did not feel capable of continuing to work and, on her VA disability benefits application, that she no longer felt "capable of handling the rigors and responsibilities of nursing" because of mental health symptoms from her military service.  Ex. I, at 1086.  In 2019, she began receiving more than $36,000 per year in VA disability benefits, which would have enabled her to work less.  Because Ms. Kucsma did not adequately account for such facts, her assumption that Ms. Lucenti's earning capacity should be calculated from 2016 to 2026 based on what she earned as a full-time RN from 2012 through 2014 was simply too speculative to credit.  *Cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21–22 (2d Cir. 1996); *Silvestro v. City of New York*, 2009 U.S. Dist. LEXIS 134117, at *9-10 (E.D.N.Y. Jan. 9, 2009).

In her post-trial briefing, the plaintiff argues that Ms. Kucsma's analysis should not be rejected because of "a few noted inaccuracies in figures inputted," such as her application for and receipt of VA disability benefits, but she did not offer any way to adjust Ms. Kucsma's analysis to account for such "inaccuracies."  Pl.'s Reply Br. 11.  Moreover, the above-noted facts are not merely a "few noted inaccuracies" that can be disregarded, but fundamental considerations necessary to evaluate the plaintiff's earning capacity had Ms. Lucenti been properly diagnosed in 2015 with renal cell carcinoma.

Nonetheless, Ms. Lucenti's testimony at trial and other evidence in the record does establish her entitlement to damages for some lost past and future wages.  From 2022 until recently,

she had been working at SCMHC approximately two to three days per week.  However, since October 2023, she has been able to go into work only about one day per week because of symptoms from her Stage IV renal cell carcinoma that have made her feel "too sick to go into work."  Trial Tr. 40.  At SCMHC, Ms. Lucenti earns $40 per hour and, on days she works, works about eight hours per day (totaling $320 per day).  Therefore, Ms. Lucenti established that her Stage IV renal cell carcinoma has proximately caused her to miss about one and a half days of work per week, or $480 of lost wages per week, beginning in October 2023, which will continue until the date that she plans to retire, or when she is 72 years old on September 24, 2026.  Accordingly, for the loss of one and a half days of work per week, I award Ms. Lucenti $3,291 in past lost wages for the period October 2023 until November 17, 2023, or the end of the trial, and $71,450 in future lost wages for the period November 18, 2023 until September 24, 2026.

### 2.  Loss of Past and Future Household Services

Ms. Lucenti has conceded that, under *Schultz v. Harrison Radiator Division General Motors Corp.*, 90 N.Y.2d 311 (1997), she is not entitled to any damages for loss of past household services because she did not present evidence at trial that she incurred any past "actual expenditures on household services."  *Id.* at 320.

As to loss of future household services, an award should be made "only for those services which are reasonably certain to be incurred and necessitated by plaintiff's injuries."  *Id.* at 320–21.  Here, there was no testimony as to the number of hours per week, month, or year that Ms. Lucenti was now "reasonably certain to" pay for household services in the future.  Ms. Lucenti did not offer such testimony.  And Ms. Kucsma, who testified on behalf of Ms. Lucenti on this issue, stated only that it was a question for the trier of fact to determine.  Thus, I have no basis to and do not make an award for loss of future household services.

**V.     Conclusion**

The Clerk of Court is directed to enter judgment in favor of the plaintiff and against the government.  The plaintiff is awarded $1,600,000 for past pain and suffering, $1,200,000 for future pain and suffering, $3,291 in past lost wages and $71,450 in future lost wages.


                                        **SO ORDERED.**


                                        _____/S/_____

                                        **NINA GERSHON**
                                        **United States District Judge**


August 6, 2024
Brooklyn, New York